Ken KEMPFER, Plaintiff-Respondent,

v.

AUTOMATED FINISHING, INC., Defendant-Appellant.

Supreme Court

*No. 95–0649.  Oral argument October 31, 1996.—Decided June 20, 1997.*

(Also reported in 564 N.W.2d 692.)

100

101

103

ABRAHAMSON, C.J., concurs.
BRADLEY, J., joins.
STEINMETZ, J., concurs.

For the defendant-appellant there were briefs by *Joseph E. Redding, Thomas R. Napierala* and *Glojek Limited*, West Allis and oral argument by *Thomas R. Napierala*.

For the plaintiff-respondent there was a brief by *Joseph J. Welcenbach* and *Welcenbach & Widmann, S.C.*, Milwaukee and oral argument by *Joseph J. Welcenbach* and *Patricia Meunier* of *Shneidman,*

*Myers, Dowling, Blumenfield, Ehlke, Hawks & Domer*, Milwaukee.

Amicus curiae brief was filed by *Timothy G. Costello* and *Krukowski & Costello, S.C.*, Milwaukee for the Wisconsin Manufacturers & Commerce.

¶ 1.   JON P. WILCOX, J.   This case is on certification from the court of appeals following a jury trial. The jury concluded that the plaintiff, Ken Kempfer (Kempfer), was entitled to damages of $22,167 for past wages and benefits and $145,000 for future lost wages and benefits from Automated Finishing, Incorporated (AFI) for his wrongful discharge. The Circuit Court for Waukesha County, Patrick L. Snyder, Judge, denied AFI's motions after verdict. AFI appealed.

¶ 2.   On certification, we consider: (1) whether, as a matter of law, Kempfer identified a fundamental and well-defined public policy, (2) whether Kempfer, an employee-at-will, demonstrated that he was terminated for refusing to act contrary to a fundamental and well-defined public policy; and (3) whether the circuit court erroneously exercised its discretion by allowing the jury to consider awarding damages of future wage loss. We hold that Kempfer identified a fundamental and well-defined public policy and that he was terminated for refusing to act contrary to that public policy; however, we also hold that the circuit court erroneously exercised its discretion when it allowed the jury to consider awarding damages for Kempfer's future wage loss. The circuit court should have determined whether reinstatement was feasible. If it was not feasible, the circuit court should have determined what amount, if any, of front pay was necessary to make Kempfer

whole. Thus, we affirm in part and reverse in part the decision of the circuit court.

¶ 3. The relevant facts are not in dispute. Kempfer was hired by the defendant, AFI, on October 8, 1981. He was initially assigned to perform urethane mold work. After approximately five years, Kempfer's job duties began to vary and at some point AFI began to ask Kempfer and three other employees to make as-needed deliveries with a 22-foot International Harvester flatbed truck. The truck had been purchased in 1984 and its weight was registered with the Department of Transportation as 32,000 pounds. At the time Kempfer began driving the truck, AFI indicated that the only requirement was that the drivers hold a valid, regular driver license.

¶ 4. On March 1, 1993, Kempfer, while returning from a delivery, was stopped by a state patrol officer who had noticed that the truck had a cracked windshield. The officer issued warning tickets to AFI for the cracked windshield and to Kempfer for not having a commercial driver license (CDL). The officer explained that due to the weight of his truck Kempfer was required by law to hold a CDL and that further violations would result in personal fines and/or jail time.

¶ 5. When he returned to the plant, Kempfer gave both citations to the plant manager. Kempfer then made the first of four trips to the Department of Motor Vehicles (DMV) to learn more about the CDL requirements. He picked up some informational booklets about the CDL requirements which he later gave to his employer.

¶ 6. AFI subsequently asked Kempfer to drive the truck on six separate occasions. Kempfer refused each time stating that he did not have the required CDL to drive the truck. Kempfer stated that he was not

told by AFI to get a CDL and that he would have needed to use AFI's truck to take the test. Accordingly, he never obtained a CDL.

¶ 7. On the morning of April 16, 1994, the plant manager again told Kempfer to drive the truck. Kempfer refused stating that he did not have the proper licensing. The plant manager found another employee to drive the truck, and reported Kempfer's refusal. As a result, Kempfer was suspended for two days. Kempfer then went to the DMV for a fourth time. An employee at the DMV called AFI to explain the CDL requirement for operation of the company truck.

¶ 8. Upon returning from his suspension on April 20, 1994, Kempfer was informed that his position had been eliminated, and, accordingly, he was fired. Kempfer's foreman, Mark Bonney, was also fired for refusing to sign Kempfer's suspension notice.

¶ 9. Kempfer filed suit alleging that he was wrongfully discharged for refusing to violate public policy. AFI argued at trial that Kempfer was released because of cost-cutting efforts to reduce the labor force. Following a three-day trial, the jury found that Kempfer was suspended and fired for his refusal to operate the company truck without a CDL. Kempfer was awarded back pay and benefits in the amount of $22,167. The jury also awarded Kempfer $145,000 for future lost wages and benefits. The circuit court denied AFI's motions after verdict and AFI appealed.

I.

⬛

¶ 10. The first issue that we address is whether as a matter of law, Kempfer identified a fundamental and well-defined public policy. This issue is a question of law, *Brockmeyer v. Dun & Bradstreet*, 113 Wis. 2d

561, 573–574, 335 N.W.2d 834 (1983), that this court reviews *de novo. Winkelman v. Beloit Memorial Hospital*, 168 Wis. 2d 12, 24, 483 N.W.2d 211 (1992). The plaintiff-employee bears the burden of proving that the dismissal violates a clear mandate of public policy. *Brockmeyer*, 113 Wis. 2d at 574.

¶ 11.   Under the employee-at-will doctrine, an employer may discharge an employee-at-will "for good cause, for no cause, or even for cause morally wrong, without being thereby guilty of legal wrong." *Id*. at 567. However, this court has recognized a "narrowly circumscribed public policy exception" to this general rule. *Id*. at 574. Specifically, this exception provides that an employer may not discharge an employee for refusing a command to violate a fundamental and well-defined public policy. *Bushko v. Miller Brewing Co.*, 134 Wis. 2d 136, 141, 396 N.W.2d 167 (1986).

¶ 12.   This court first recognized the public policy exception to the employee-at-will doctrine in *Brockmeyer*. In that case, this court explained what was meant by a fundamental and well-defined public policy:

> Public policy is a broad concept embodying the community common sense and common conscience. . . .The provisions of the Wisconsin Constitution initially declared the public policies of this state. Each time the constitution is amended, that also is an expression of public policy. In addition, public policy is regularly adopted and promulgated in the form of legislation. These declarations of public policy are inherently incorporated into every employment at will relationship.

Given the vagueness of the concept of public policy, it is necessary that we be more precise about the contours of the public policy exception. A wrongful discharge is actionable when the termination clearly contravenes the public welfare and gravely violates paramount requirements of public interest. The public policy must be evidenced by a constitutional or statutory provision. *An employee cannot be fired for refusing to violate the constitution or a statute.* Employers will be held liable for those terminations that effectuate an unlawful end.

We intend to recognize an existing limited public policy exception. An employer may not require an employee to violate a constitutional or statutory provision with impunity. If an employee refuses to act in an unlawful manner, the employer would be violating public policy by terminating the employee for such behavior.

*Brockmeyer,* 113 Wis. 2d at 573 (emphasis added). However, this court warned:

Courts should proceed cautiously when making public policy determinations. No employer should be subject to suit merely because a discharged employee's conduct was praiseworthy or because the public may have derived some benefit from it.

*Id.* at 573–74. This court's rejection of an expansive exception to the employee-at-will doctrine is also illustrated by the refusal in *Brockmeyer* to impose an implied covenant and fair dealing on employers:

We refuse to impose a duty to terminate in good faith into employment contracts. To do so would "subject each discharge to judicial incursions into the amorphous concept of bad faith." Moreover, we feel it unnecessary and unwarranted for the courts

to become arbiters of any termination that may have a tinge of bad faith attached. Imposing a good faith duty to terminate would unduly restrict an employer's discretion in managing the work force.

*Id.* at 569 (citation omitted).

■

¶ 13.   This court again considered Wisconsin's narrow public policy exception to the employee-at-will doctrine in *Bushko*, 134 Wis. 2d 136. In that case, this court considered whether the public policy exception included employees who were discharged for acting consistent with a fundamental and well-defined public policy when there was no order by the employer to violate the public policy. This court stated:

> The plaintiff is not required under *Brockmeyer* to prove the employer had an evil intent in the discharge. Likewise, gratuitous allegations or other evidence of evil intent will not save a cause of action from defendant's motion for summary judgment if the elements required by *Brockmeyer* are not present. *Brockmeyer* requires an employee allege and attest that he was discharged for refusing to violate a constitutional or statutory provision. Although *Brockmeyer* was intended to provide relief for the employee who was a victim of evil intent, it did so under very limited circumstances. *Brockmeyer* defined the cause of action and the standards for summary judgment in such a way that the trial judge need not inquire into the intent of the employer.
>
> . . .
>
> An employee who refuses a command to violate public policy is acting consistent with public policy. However, if the employee of his own volition acts consistently with public policy, he does no more

than obey the law. Such consistent action, without an employer's command to do otherwise, is merely "praiseworthy" conduct.

*Id.* at 141–42. Accordingly, the public policy exception does not apply in cases where the employee-at-will is simply discharged for acting consistently with the fundamental and well-defined public policy; there must be an order by the employer to violate the public policy.

¶ 14.   We are provided with further guidance on the scope of this public policy exception by this court's decision in *Winkelman,* 168 Wis. 2d 12. In that case, this court considered whether a fundamental and well-defined public policy could be evidenced by an administrative rule rather than a statutory or constitutional provision. *Id.* at 21. This court stated:

> We hold that where a fundamental and well-defined public policy is evidenced by an administrative rule, a discharge for refusal to violate that public policy is actionable. The guiding principle of *Brockmeyer* is not a slavish adherence to the arbitrary requirement that the public policy be evidenced by a statutory or constitutional procedure; rather, it is that an employer must not be allowed to discharge an employee for the employee's refusal to violate a formally stated, fundamental and well-defined public policy which has the effect of law. Heretofore we have required that the public policy be evidenced by a statutory or constitutional provision as a means to protect the public from frivolous lawsuits by allowing the circuit court to screen cases on motions to dismiss or motions for summary judgment. [*Brockmeyer*, 113 Wis. 2d at 574]. The facts of this case make clear that public policy that is fundamental and important may be enunciated in administrative rules and that to use such rules will

not frustrate this type of screening. An administrative rule, as well as statutory or constitutional provision, may contain a clear expression of public policy.

*Id.* at 22. Accordingly, in *Winkelman,* this court recognized that the definition of the public policy exception in *Brockmeyer* includes fundamental and well-defined public policies that are evidenced by statutory, constitutional, or administrative provisions. However, this definition does not include case law and it does not mean that every statutory, constitutional, or administrative provision evidences a fundamental and well-defined public policy.

¶ 15.   If a public policy is not contained in a statutory, constitutional, or administrative provision, it cannot fall under the public policy exception to the employee-at-will doctrine. However, just because a public policy is evidenced by a statutory, constitutional, or administrative provision does not mean that it falls under the exception. This was recognized by this court in *Winkelman:*

> We however do not hold that all administrative rules implicate fundamental public policy. Neither do all statutes. Rather, it is the content of either a rule or statute that determines whether a fundamental public policy is stated.

*Id.* at 24. Accordingly, the public policy must still be found to be fundamental and well defined. This is determined by the guidelines set forth in *Brockmeyer.* *See Brockmeyer,* 113 Wis. 2d at 573–74.[1]

---

[1] We note that an administrative rule is less likely to satisfy the fundamental and well-defined requirements than a statutory provision and that a statutory provision is less likely to rise

¶ 16.  Thus, the Wisconsin public policy exception to the employee-at-will doctrine is very narrow. It only provides that an employee may not be discharged for refusing a command to violate a fundamental and well-defined public policy that is evidenced by a constitutional, statutory, or administrative provision. With the exception of such a public policy, an employer may discharge an employee-at-will for any reason or no reason.

¶ 17.  AFI contends that the public policy recognized by the circuit court—that an employer cannot require someone to violate the law—was not grounded in a specific constitutional or statutory provision which evidenced a fundamental and well-defined public policy. Kempfer asserts that the circuit court identified two fundamental and well-defined public policies: (1) the public policy against improperly licensed commercial drivers evidenced by Wis. Stat. § 343.05(2)(a) (1993–94);[2] and (2) the public policy against employers ordering employees to violate a statute that carried criminal penalties.

■

¶ 18.  We find that Kempfer identified a fundamental and well-defined public policy sufficient to

to the level of fundamental and well defined than a constitutional provision.

[2] Unless otherwise stated, all future statutory references are to the 1993–94 volume. Wis. Stat. § 343.05(2)(a) provides in relevant part:

> **(2)** COMMERCIAL MOTOR VEHICLES. (a) No person may operate a commercial motor vehicle upon a highway in this state unless the person is one of the following:
> 1.  A resident who is at least 18 years of age, who is not disqualified under s. 343.315, who has a valid commercial driver license which is not revoked, suspended, canceled, or expired and, for the operation of any vehicle type under s. 343.04(2), has an endorsement authorizing operation of the vehicle type.

invoke Wisconsin's public policy exception to the employee-at-will doctrine. Wis. Stat. § 343.05(2)(a) sets forth the requirements for operating a commercial vehicle in Wisconsin. If a person operates a commercial vehicle without complying with these requirements the driver and his or her employer may be subject to penalties under Wis. Stat. § 343.245. The guidelines for operating a commercial vehicle contained in § 343.05(2)(a) which are designed to promote highway safety and violation of which may be punished by fine and/or incarceration constitute a fundamental and well-established public policy—to promote highway safety through the use of regulations and penalties.

## II.

■

¶ 19.  The next issue that we address is whether Kempfer, an employee-at-will, demonstrated that he was terminated for refusing to act contrary to a fundamental and well-defined public policy. This is a jury finding that this court will not overturn if there is any credible evidence that supports the verdict. *Coryell v. Conn,* 88 Wis. 2d 310, 315, 276 N.W.2d 723 (1979). In addition, this court views the evidence in the light most favorable to the verdict. *Roach v. Keane,* 73 Wis. 2d 524, 536, 243 N.W.2d 508 (1976).

¶ 20.  As we have already found that Kempfer identified a fundamental and well-defined public policy, we need only determine whether any credible evidence supports the jury's finding that Kempfer was discharged for refusing to act contrary to that public policy. AFI contends that there is no evidence to support that Kempfer was terminated for failing to act contrary to a fundamental public policy. In support of this contention, AFI states that only Kempfer could

have obtained a CDL and that AFI did not prevent him from doing so. AFI further states that it only told Kempfer to "drive the truck."

¶ 21.   We conclude that under the facts of this case commanding Kempfer to drive the truck with full knowledge that he did not have the required license is tantamount to commanding him to violate public policy. At the time that AFI ordered him to drive the truck it knew that Kempfer did not have a CDL. Kempfer refused to drive the truck and was suspended by AFI. Accordingly, there is credible evidence to support the jury's finding that Kempfer was discharged for refusing to act contrary to a fundamental and well-defined public policy.

## III.

¶ 22.   The last issue that we consider is whether the circuit court erroneously exercised its discretion by allowing the jury to consider awarding damages of future wage loss. Discretionary acts of the circuit court are upheld absent an erroneous exercise of discretion. *Johnson v. Johnson*, 78 Wis. 2d 137, 143–44, 254 N.W.2d 198, 202 (1977). Failure to apply the proper standard of law is an erroneous exercise of discretion. *Loy v. Bunderson*, 107 Wis. 2d 400, 411–15, 320 N.W.2d 175 (1982).

¶ 23.   During the course of the trial in this case, the circuit court decided to allow the jury to consider whether Kempfer would suffer a future wage loss. The circuit court gave the jury the following instruction:

> If you are satisfied that the plaintiff will suffer a future wage and benefit loss as the natural result of

115

his wrongful discharge, then include in your answer to question 2 such sum as will fairly and reasonably compensate plaintiff for such future loss of wages and benefits . . .

AFI contends that this was an erroneous exercise of the circuit court's discretion because in an at-will employment relationship there are no foreseeable future damages upon which to base an award of future lost earnings because the parties cannot foresee the duration of the employment relationship. Kempfer asserts that the decisions of the court of appeals in *Weyenberg Shoe Mfg. Co. v. Seidl*, 140 Wis. 2d 373, 410 N.W.2d 604 (Ct. App. 1987), *Brogan v. Industrial Casualty Ins. Co.*, 132 Wis. 2d 229, 392 N.W.2d 439 (Ct. App. 1986), and *Hale v. Stoughton Hosp. Assoc., Inc.*, 126 Wis. 2d 267, 376 N.W.2d 89 (Ct. App. 1985), illustrate that future wages are an available remedy in public policy exception cases.

¶ 24. In *Weyenberg*, a jury determined that the employee had been wrongfully terminated for participating in national guard exercises. The jury awarded the employee $57,000 for past damages, $35,000 for future damages, and $15,000 for lost employee benefits. The court of appeals agreed with the trial court that there was sufficient evidence to support the jury's finding that the plaintiff was terminated for participating in the national guard exercises. However, the court of appeals also held that the termination did not fall under the *Brockmeyer* public policy exception to the employee-at-will doctrine:

> Because [the plaintiff's] action in going to guard camp is *consistent with* public policy rather than *a refusal to violate* public policy, termination for said conduct does not fall within the extremely narrow

> exception of the employment at will doctrine under *Brockmeyer* and *Bushko*.

*Weyenberg*, 140 Wis. 2d at 383 (emphasis in original). The court of appeals instead upheld the jury's award of damages based on a finding that the plaintiff had been discharged in violation of the Vietnam Era Veterans' Readjustment Assistance Act, 38 U.S.C. § 2021(b)(3) (1982). Kempfer contends that the *Weyenberg* decision is significant because the court of appeals upheld the propriety of the jury's award of future damages to an at-will employee. We do not find this case significant as it does not concern the public policy exception to the employee-at-will doctrine. Whether an award of future damages is appropriate under 38 U.S.C. § 2021(b)(3) (1982) does not bear on whether such an award is consistent with *Brockmeyer*, and, thus, available under the public policy exception to the employee-at-will doctrine.

¶ 25. The next case that Kempfer relies on, *Brogan*, also did not involve the public policy exception to the employee-at-will doctrine. This was a breach of contract case that centered on whether the contract was rendered void by Wis. Stat. § 611.63 (1983–84). *Brogan*, 132 Wis. 2d at 233. The court of appeals held that the contract was not void and upheld the jury's award of future damages to the plaintiff. Of particular significance, according to Kempfer, is the court of appeals' statement that "[t]he amount of damages awarded is a matter resting largely in the jury's discretion." *Id.* at 238. In so relying on the court of appeals' decision in *Brogan*, Kempfer fails to consider the distinction between those employed pursuant to a contract and those who are employed at will. This case does not pertain to the at-will employment relationship and is not relevant to our decision.

¶ 26.　Kempfer also relies on the court of appeals' decision in *Hale*. In that case, the plaintiff brought suit against his former employer for wrongful termination and tortious interference with contract. At trial, the jury was given two verdict questions. The first question involved whether the defendant-employer had wrongfully terminated the plaintiff-employee. This question and the accompanying instruction was derived from the court of appeals decision in *Brockmeyer v. Dun & Bradstreet*, 109 Wis. 2d 44, 325 N.W.2d 70 (Ct. App. 1982). The second question concerned the tortious interference with contract claim. The jury did not answer the second question, but found that the plaintiff had been wrongfully discharged. Shortly after the jury returned its verdict in *Hale*, this court rejected the court of appeals' holding in *Brockmeyer*. The circuit court concluded that it had applied the wrong law and ordered a new trial on whether the plaintiff-employee had been wrongfully terminated. Kempfer contends that *Hale* supports his position because the court of appeals endorsed the award of future wages in a wrongful termination case. What Kempfer fails to mention is that the plaintiff-employee in *Hale* was not an employee-at-will. The court of appeals stated:

> Nor does the wrongful termination question and instruction adequately describe the duty that the hospital accepted in its bylaw. We agree that the bylaw creates more than a mere "at will" employment relationship. Unlike an "at will" employer, the [defendant-employer] could not discharge [the plaintiff-employee] for any or even no cause.

*Hale*, 126 Wis. 2d at 275. Thus, neither *Hale, Weyenberg,* nor *Brogan* is relevant to whether an employee-

at-will who is discharged for refusing to violate a fundamental public policy is entitled to front pay.

■

¶ 27. Our determination of this issue is controlled by this court's decision in *Brockmeyer*. In *Brockmeyer*, this court held that under Wisconsin's public policy exception to the employee-at-will doctrine, the wrongfully discharged employee's right to compensation is in contract. In reaching this conclusion, the court considered whether such a wrongful discharge suit would most appropriately be brought as a tort or contract action. This court determined that contract was more appropriate because the damages available in those suits best reflected the damages stemming from wrongful discharge suits:

> The most significant distinction in our view between the two causes of action in wrongful discharge suits is in the damages that may be recovered. In tort actions, the only limitations are those of "proximate cause" or public policy considerations. Punitive damages are also allowed. In contract actions, *damages are limited by the concepts of foreseeability and mitigation.* The remedies established by the majority of Wisconsin wrongful discharge statutes are *limited to reinstatement and backpay*, contractual remedy concepts. *We believe that reinstatement and backpay are the most appropriate remedies for the public policy exception wrongful discharges since the primary concern in these actions is to make the wronged employee "whole."* Therefore, we conclude that a contract action is most appropriate for wrongful discharges.

*Brockmeyer*, 113 Wis. 2d at 575 (emphasis added). Accordingly, *Brockmeyer* stands for the proposition

that reinstatement and backpay are the most appropriate remedies.

¶ 28. Kempfer argues that *Brockmeyer* did not expressly limit the damages for a wrongfully discharged employee-at-will to reinstatement and backpay when there is a more appropriate remedy. According to Kempfer, it is more appropriate in this case to award him future wages instead of reinstatement. We agree that there may be some cases where an award of front pay in lieu of reinstatement is necessary to make the wronged employee whole. However, as *Brockmeyer* limited damages in almost all cases to reinstatement and backpay, front pay can only be available when there is no other avenue to make the employee whole. In other words, front pay is only an available remedy in those cases in which the employee has been discharged for refusing to violate a fundamental and well-defined public policy and reinstatement is not feasible.

¶ 29. Reinstatement is not feasible if the employee cannot be placed in the same or a similar position or if the company refuses to reinstate the employee. However, reinstatement is not infeasible simply because a plaintiff claims that he or she does not get along with the employer or because the plaintiff claims that he or she is not comfortable working for someone who previously terminated him or her.

¶ 30. In those situations where reinstatement is not feasible an award of front pay is still limited by the concepts of foreseeability and mitigation. *See Brockmeyer*, 113 Wis. 2d at 575; *see also Klug v. Flambeau Plastics Corp.*, 62 Wis. 2d 141, 155, 214 N.W.2d 281 (1974) (requiring that the injured party in

an employment situation "must make reasonable efforts to mitigate damages."). Thus, in determining whether front pay is available, when reinstatement has already been deemed infeasible, the court must consider (1) the extent of front pay, if any, foreseeable under the circumstances of the case, and (2) what effect the employee's mitigation will have on the award of front pay.

¶ 31. Accordingly, the circuit court must first determine whether reinstatement is feasible. If the circuit court concludes that reinstatement is not feasible then the court rather than the jury should determine the amount of front pay, if any, that is necessary to make the wronged employee whole. *See Stafford v. Electronic Data Systems Corp.*, 741 F. Supp. 664, 667 (E.D. Mich. 1990). In the present case, the circuit court did not consider whether reinstatement was infeasible, but submitted the question of front pay to the jury. Thus, we hold that the circuit court erroneously exercised its discretion when it allowed the jury to consider future wage loss in its damages determination. The cause is remanded for a determination of whether reinstatement is not feasible, and, if so, for a calculation of front pay by the circuit court.

*By the Court.*—The decision of the circuit court is affirmed in part and reversed in part.

¶ 32. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(concurring)*. I agree with the majority opinion's resolution of the preliminary question in this case, that the plaintiff was discharged in violation of a fundamental and well-defined public policy. I also agree that the case should be remanded to determine

whether front pay should be awarded and, if so, how much.

¶ 33. I write separately: (1) because the availability of an award of front pay for discharge of an at-will employee is not obvious and I want to explain why I conclude that front pay should be available; (2) to suggest several considerations the circuit court might entertain in awarding front pay upon remand; and (3) to explore the respective roles of the circuit court and the jury on remand in determining front pay in lieu of reinstatement.

## I.

¶ 34. The dual goals of a *Brockmeyer* cause of action for wrongful discharge of an at-will employee are to make wronged employees whole and to deter employers' violations of public policy.[1] The court's decisions relating to public policy wrongful discharge give little practical guidance concerning remedies generally. Nonetheless, the *Brockmeyer* court set forth certain general propositions regarding remedies in its effort to paint the outlines of the newly recognized cause of action: (1) the remedial goal is to make the wronged employee whole and to advance well-established public policies; (2) remedies should be controlled by contract rather than tort principles; thus foresee-

---

[1] Cases subsequent to *Brockmeyer v. Dun & Bradstreet*, 113 Wis. 2d 561, 335 N.W.2d 834 (1983), have more fully addressed the contours of the cause of action. *Wandry v. Bull's Eye Credit Union*, 129 Wis. 2d 37, 384 N.W.2d 325 (1986); *Bushko v. Miller Brewing Co.*, 134 Wis. 2d 136, 396 N.W.2d 167 (1986); *Schultz v. Production Stamping Corp.*, 148 Wis. 2d 17, 434 N.W.2d 780 (1989); *Winkelman v. Beloit Mem'l Hosp.*, 168 Wis. 2d 12, 483 N.W.2d 211 (1992). None of these cases has addressed the question of remedies.

ability and mitigation limit the range of available remedies; and (3) the most appropriate remedies are reinstatement and back pay. *Brockmeyer v. Dun & Bradstreet*, 113 Wis. 2d 561, 574–76, 335 N.W.2d 834 (1983).[2]

¶ 35.   While reinstatement and back pay are, as *Brockmeyer* stated, the most appropriate remedies, reinstatement is not appropriate in certain cases. In these cases, I conclude that an award of front pay should be available to fill the remedial gap. Front pay is necessary to achieve the principles set forth in *Brockmeyer*: (1) front pay comports with the *Brockmeyer* principle that reinstatement and back pay are the most appropriate remedies; (2) while reinstatement is an important remedy for making wronged employees whole, there are often serious obstacles to reinstatement and it is rarely ordered; (3) front pay is designed to achieve precisely what reinstatement would achieve, were reinstatement feasible: to place the wronged employee in the position he or she would be in had there been no wrongful discharge; (4) awarding front pay comports with the *Brockmeyer* contract theory of damages for wrongful discharge; and (5) allowing front pay comports with the *Brockmeyer* court's reliance on Wisconsin and federal wrongful dis-

---

[2] For discussions of *Brockmeyer*'s contract approach, see Henry H. Perritt, Jr., *Employee Dismissal Law and Practice*, § 1.2 at p. 8 (3d ed. 1992); Dan B. Dobbs, *Law of Remedies: Damages—Equity—Restitution*, § 6.10(2) at p. 195–96 and nn.13, 14 (2d ed. 1993). *See also* John C. McCarthy, *Recovery of Damages for Wrongful Discharge*, § 1.31 at pp. 118–19 (1990) (doctrine of foreseeability and the unavailability of punitive damages characterize "elusive" differences between contract and tort damages for public policy wrongful discharge).

charge statutes for crafting the common law cause of action for wrongful discharge.

¶ 36. First, front pay comports with the *Brockmeyer* principle that reinstatement and back pay are the most appropriate remedies. If employers know that only reinstatement and back pay are legally available, and that front pay is not available in lieu of reinstatement, reinstatement will cease to be available in fact. Barring front pay as a substitute for reinstatement will create a perverse incentive for employers who wrongfully discharge employees in violation of public policy to make reinstatement not feasible. In essence, were front pay not available when reinstatement is not feasible the deterrent effect of the cause of action would be undermined or the employer could discharge an employee in violation of public policy by paying a minimum amount of damages.[3]

¶ 37. Second, while reinstatement is an important remedy for making wronged employees whole, there are often serious obstacles to reinstatement and

---

[3] Unless the court holds as it does, employers would have the further incentive of admitting to liability instantly after wrongfully discharging an employee and employees would be encouraged to delay asserting a cause of action. In that way employers would seek to reduce amounts they pay to wrongfully discharged employees and employees would seek to increase the amounts they receive. The deterrent effect of the public policy wrongful discharge cause of action would be seriously threatened.

it is rarely ordered.[4] Reinstatement has high costs for employers and employees,[5] as well as for the courts.[6]

[4] Professor Dobbs has noted as follows: "Common law remedies for an employer's breach of an employment contract have not traditionally included specific performance. Although reinstatement has been mentioned quite casually in some common law wrongful discharge cases [quoting *Brockmeyer*], it seems not actually to have been sought or granted." Dobbs, *Law of Remedies*, § 6.10(2) at p. 198 and n.28 (citations omitted). *See also* Lex K. Larson, *Unjust Dismissal*, § 9A.02[2] at p. 9A–9 (3/97) ("reinstatement is not normally awarded, due to the often deteriorated employment relationship").

Nonetheless, many courts consider reinstatement "the preferred remedy." *See, e.g., Sasser v. Averitt Express, Inc.*, 839 S.W.2d 422, 439 (Tenn. Ct. App. 1992); *Stafford v. Electronic Data Sys. Corp.*, 749 F. Supp. 781, 785 (E.D. Mich. 1990)(applying Michigan law); *McNeil v. Economics Lab., Inc.*, 800 F.2d 111, 118 (7th Cir. 1986), *cert. denied*, 481 U.S. 1041 (1987), *overruled on other grounds*, 860 F.2d 834 (1988).

The majority opinion does not discuss whether the employee in this case sought, or whether the employer offered, reinstatement. Reinstatement was not ordered.

[5] Courts evaluating the feasibility of reinstatement have identified various obstacles to the remedy for both employers and employees. No suitable position may be available; other employees may be displaced or otherwise disrupted; or, quite commonly, there is such hostility that a productive and amicable working relationship would be impossible, such that the conditions would amount to a constructive discharge. *See Sasser*, 839 S.W.2d at 433; *Stafford*, 749 F. Supp. at 785–86; *McNeil*, 800 F.2d at 118–19; Restatement (Second) of Contracts § 367(1) (1981) (noting "undesirability of compelling the continuance of personal association after disputes have arisen"). These same considerations are often used as factors in determining the feasibility of reinstatement.

[6] Reinstatement imposes costs on courts which front pay may not. A reinstatement order requires either careful contin-

¶ 38. Because of the costs of reinstatement for employers, employees and courts it has been suggested that front pay more efficiently compensates the future economic loss flowing from a wrongful discharge. Chief Judge Posner has offered the following economic analysis supporting front pay:

> [T]he social costs of [reinstatement] may be avoided by corrective transactions. Suppose that reinstatement would be worth $100,000 to the employee but would cost the employer $150,000 because of a negative effect of reinstatement on the employer's productivity; in contrast, an award of $100,000 would cost the employer only $100,000 while benefiting the employee to the tune of $100,000. The substitution of front pay for reinstatement would produce a savings in social costs of $50,000—yet if front pay were unavailable, the employer might buy out the employee's right of reinstatement, since at any price between $100,000 and $150,000 both parties would be made better off by such a buy-out. Front pay may still be the socially preferable form of relief, because it avoids the need for a tricky transaction.

ued monitoring or risks spurring additional litigation surrounding issues of compliance and retaliation. The Seventh Circuit Court of Appeals described the costs of reinstatement for courts as follows:

> Courts of equity traditionally have refused to order specific performance of employment contracts, because it is difficult and time-consuming for a court to supervise the parties' conduct in an ongoing and possibly long-term relationship of employment. . . .Courts do not want to involve themselves in the industrial equivalent of matrimonial squabbling.

*McKnight v. General Motors Corp.*, 908 F.2d 104, 115 (7th Cir. 1990).

*Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1232 (7th Cir. 1995) (citation omitted).

¶ 39.   Third, front pay is designed to achieve precisely what reinstatement would achieve, were reinstatement feasible: to place the wronged employee in the same position he or she would be in had there been no wrongful discharge. Front pay makes up the difference between the earnings an employee would receive were the old employment to continue and the earnings expected in present and future employment. Thus, front pay substitutes for reinstatement in that it remedies future economic losses flowing from the wrongful discharge. In conjunction with recovery of past wage loss through a back pay award, front pay, like reinstatement, remedies the wrongful discharge itself and assures that the wronged employee is made whole.

¶ 40.   When reinstatement is not feasible, back pay is insufficient to make a wronged employee whole. Back pay compensates for the loss of wages until judgment; it does not remedy the wrongful discharge itself. Reinstatement remedies the wrongful discharge and precludes economic loss that would otherwise flow from the wrongful discharge. If reinstatement is not feasible and the discharged employee's new employment opportunities are inferior, the employee should receive front pay. "The logic of such an award, if the purpose. . .is indeed to make the plaintiff whole, is undeniable." *McKnight v. General Motors Corp.*, 908 F.2d 104, 116–17 (7th Cir. 1990).[7]

---

[7] The Seventh Circuit Court of Appeals discussed front pay under Title VII as follows, without deciding the issue:

> [T]he Supreme Court has said that the remedial scheme in Title VII is designed to make the plaintiff whole, and this dictum has been thought by some courts to imply that if the plaintiff's employ-

¶ 41. Front pay fulfills the expectation interest where otherwise there would be a remedial void. "Wrongfully discharged employees may have valid claims for lost future wages. Such an award of 'front pay' is predicated on the 'rightful place' theory; i.e., that wrongfully discharged employees are entitled to the benefit of the jobs they would have obtained but for the discharge." Paul H. Tobias, *Litigating Wrongful Discharge Claims*, § 8.12 at pp. 8–37–38 (6/91).

¶ 42. Fourth, awarding front pay comports with the *Brockmeyer* contract theory of damages for wrongful discharge. For a remedy to be available in a contract action the fact of loss must be foreseeable. Restatement (Second) of Contracts § 351 (1981). It is enough that the loss was foreseeable as a probable, as distinguished from a necessary, result of the breach. *Id.* at cmt. a.

¶ 43. An employer might argue that because an at-will employee has no expectation of future employment with this employer for a definite term, the loss of future wages is unforeseeable and front pay is inappropriate. This argument confuses the foreseeability of the harm, lost future wages, with the foreseeability of the amount of the loss. Only the former need be foresee-

ment opportunities are inferior and reinstatement is infeasible, he should receive in addition to back pay a lump sum—called "front pay" to distinguish it from the remedy of back pay specified in the statute—representing the discounted present value of the difference between the earnings he would have received in his old employment and the earnings he can be expected to receive in his present and future, and by hypothesis inferior, employment. The logic of such an award, if the purpose of Title VII's remedial scheme is indeed to make the plaintiff whole, is undeniable.

*McKnight*, 908 F.2d at 116–17 (citations omitted).

able; the latter need only be reasonably calculable.[8] Restatement (Second) of Contracts § 352 (1981).

¶ 44.   The harm of future wage loss to a wrongfully discharged indefinite term employee is foreseeable. Although an at-will employee may be discharged at any time for many reasons, or no reason, an at-will employee may not be discharged for a reason that violates public policy. It is foreseeable that if wrongfully discharged, the at-will employee will suffer economic harm due to many factors including having to begin new employment at or near the bottom of a seniority or experience-based pay scale. That harm flows necessarily from the employer's wrongful conduct.[9]

¶ 45.   The argument against the availability of front pay, that "[s]uch employment relationships do not exist for a foreseeable, definite period of time," is not an argument that the loss of future wages is unforeseeable. Rather it is an argument that the amount of the loss is difficult to ascertain with certainty. This is doubtless true.[10] As one court has put it:

---

[8] "The existence of damages must be proved; the amount of damages must be decided with all the certainty the case permits." *Panhandle Eastern Pipe Line Co. v. Smith*, 637 P.2d 1020, 1027 (Wyo. 1981) (approving award of front pay to indefinite term employee for employer's breach).

[9] *See Repinski v. Clintonville Sav. & Loan Ass'n*, 49 Wis. 2d 53, 58, 181 N.W.2d 351 (1970) ("An award of damages for breach of contract should compensate the injured party for losses necessarily flowing from the breach"); Wis JI—Civil 3710.

[10] As Professor Corbin has instructed:

> The rules of law governing the recovery of damages for breach of contract are very flexible. Their application in the infinite number of situations that arise is beyond question variable and uncertain. Even more than in the case of other rules of law, they must be regarded merely as guides to the court, leaving much to the individ-

The biggest problem in awarding future damages for the wrongful discharge of an at-will employee is avoiding speculation. . . .It is well established, however, that "while recovery will be denied if it is speculative and uncertain whether damage has been sustained, recovery will not be denied merely because the amount of damages is difficult to ascertain."

*Smith v. Smithway Motor Xpress, Inc.*, 464 N.W.2d 682, 688 (Iowa 1990)(citation omitted)(reversing trial court refusal to submit front pay question to jury in wrongful discharge action). The fact that a remedy may require a degree of uncertainty in calculating the amount of the loss is not a reason to preclude it as a matter of law. The amount of damages must be decided with all the certainty the case permits.

¶ 46.   Indeed the black letter rule in contract actions involving employment seems to be that recovery of damages includes front pay. State Bar of Wisconsin, *The Law of Damages in Wisconsin*, § 23.2 at p.23–3 (2d ed. 12/95) (Russell M. Ware, ed.); State Bar of Wisconsin, *Wisconsin Employment Law*, § 13.40 at p. 13–14 (4/95). *See, e.g., Hale v. Stoughton Hospital Ass'n, Inc.*, 126 Wis. 2d 267, 279–81, 376 N.W.2d 89 (Ct. App. 1985) (indefinite employment term, loss of future wages and pension benefits arising in ordinary course of breach of employment contract foreseeable as matter of law ).

¶ 47.   Although the measure of a front-pay remedy is uncertain, it is appropriate where necessary to make the wronged employee whole. As one court has said: "Substantial justice is better than exact injus-

ual feeling of the court created by the special circumstances of the particular case.

5 *Corbin on Contracts*, § 1002 at 33 (1964).

tice." *Weinglass v. Gibson*, 155 A. 439, 440 (Pa. 1931) (discussing need to award contract damages even where uncertain in amount).

¶ 48.   Fifth, allowing front pay comports with the *Brockmeyer* court's reliance on Wisconsin and federal wrongful discharge statutes for crafting the common law cause of action for wrongful discharge. The *Brockmeyer* court, 113 Wis. 2d at 568, 575, determined that as with state public policy statutes, reinstatement and back pay are the most appropriate remedies.[11] Yet the Wisconsin Fair Employment Act (WFEA), provides for a remedy of "compensation in lieu of reinstatement if requested by any party." Wis. Stat. § 111.389(4)(c)

---

[11] The *Brockmeyer* court recognized that the public policy wrongful discharge cause of action has the same goals as specific Wisconsin statutory causes of action for wrongful discharge, such as the Wisconsin Fair Employment Act, Wis. Stat. ch. 111, subch. II, the Wisconsin Employment Peace Act, Wis. Stat. § 111.06(1)(c)1, as well as Title VII, 42 U.S.C. § 2000e et seq., and other federal statutes prohibiting wrongful discharges in violation of public policy. Because remedying and deterring violations of public policy are at the heart of these statutory causes of action, decisions in cases brought under these statutes may provide helpful analyses for determining the appropriate remedial regime in a common law public policy wrongful discharge action. *Brockmeyer*, 113 Wis. 2d at 567–68.

The *Brockmeyer* court stated, without citation, that "[t]he remedies established by the majority of Wisconsin wrongful discharge statutes are limited to reinstatement and backpay, contractual remedy concepts." *Brockmeyer*, 113 Wis. 2d at 575. Regardless of whether this statement, drawn from the briefs of the employer (at p. 30, 35) and amicus Wisconsin Association of Manufacturers and Commerce (at p. 17), was accurate in 1983, it is not today.

(1995–96).[12] Similarly, in federal wrongful discharge statutes, front pay has been recognized as a remedy in lieu of reinstatement.[13]

---

[12] *See Byers v. LIRC*, 208 Wis. 2d 388, 397–99, 561 N.W.2d 678, (1997) (discussing public policy purposes of the WFEA and remedies available); *Watkins v. LIRC*, 117 Wis. 2d 753, 764, 345 N.W.2d 482 (1984) (finding that the WFEA provides authority to fashion appropriate remedy).

[13] Federal statutes, such as Title VII and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq., are similarly premised on remedying and deterring violations of public policy. Each has been interpreted as allowing courts to provide front pay as a substitute for reinstatement, in addition to back pay, where reinstatement is not feasible. Front pay is available under these statutes regardless of whether the employment was for an indefinite term.

The United States Supreme Court has stated that the purposes of Title VII are to remedy and deter discrimination in employment and to "make persons whole" for injuries due to unlawful employment discrimination. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417–18 (1975).

The following are among the courts that have held that front pay is available in lieu of reinstatement under Title VII: *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1528 (11th Cir. 1991); *Edwards v. Occidental Chem. Corp.*, 892 F.2d 1442, 1449 (9th Cir. 1990); *Shore v. Federal Express Corp.*, 777 F.2d 1159–60 (6th Cir. 1985); *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 889–91 (3d Cir. 1984); *McKnight v. General Motors Corp.*, 768 F. Supp. 675, 680 (E.D. Wis. 1991), *aff'd*, 973 F.2d 1366 (7th Cir. 1992), *cert. denied*, 507 U.S. 915 (1993).

The seventh circuit has stated that "all of the circuits that have decided the issue. . .have held that front pay is an available remedy in appropriate cases brought under the ADEA." *McNeil*, 800 F.2d at 118.

The seventh circuit has held that front pay is available in lieu of reinstatement in retaliatory discharge actions brought under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq.

¶ 49. Consistent with the state and federal statutes which seek to deter violations of public policy by employers and to make employees whole, a plaintiff in a common law public policy wrongful discharge action should have available the remedy of front pay when reinstatement is not feasible.

¶ 50. For these reasons all but one of the jurisdictions[14] that have considered the issue of the availability of front pay in public policy wrongful discharge actions have concluded that front pay is available where reinstatement is not feasible.[15] I, too, conclude that front pay should be an available remedy in lieu of reinstatement when reinstatement is not feasible. Front pay is consistent with the principles set out in *Brockmeyer* and state and federal statutes which

---

*Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219, 1231 (7th Cir. 1995).

[14] The Supreme Court of Arkansas has held that front pay is not available in public policy wrongful discharge actions. *Sterling Drug, Inc. v. Oxford*, 743 S.W.2d 380 (Ark. 1988).

[15] "Since much of the wrongful discharge litigation is relatively recent and has focused on the existence and breadth of the cause of action, the remedies available have not received extensive attention in reported decisions." Stephen P. Pepe & Scott H. Dunham, *Avoiding and Defending Wrongful Discharge Claims*, § 1.10 at p. 1–36 (5/93).

The following are among the courts that have resolved the question in favor of the availability of front pay: *Hummer v. Evans*, 923 P.2d 981, 987–88 (Idaho 1996); *Sasser*, 839 S.W.2d 422, 433–34; *Smith v. Smithway Motor Xpress, Inc.*, 464 N.W.2d 682, 687–88 (Iowa 1991); *Hayes v. Trulock*, 755 P.2d 830, 834 (Wash. Ct. App. 1988); *Goins v. Ford Motor Co.*, 347 N.W.2d 184, 191 (Mich. Ct. App. 1983). *See also* Francis M. Dougherty, *Damages Recoverable for Wrongful Discharge of At-Will Employee*, 44 A.L.R. 4th 1131 § 5[c] and anno. supp. (collecting cases).

seek to deter wrongful discharges violating public policy.

## II.

¶ 51.    Because this case is remanded for determination of front pay, I wish to set forth several factors that the circuit court might appropriately consider in awarding front pay. Front pay is, as one court stated, a "special remedy, not necessarily warranted in every case." *Sasser v. Averitt Express, Inc.*, 839 S.W.2d 422, 433, 439 (Tenn. Ct. App. 1992).

¶ 52.    The following factors, among others, should be considered in determining the propriety and amount of front pay when reinstatement is not feasible: (1) the employee's seniority at the time of the wrongful discharge; (2) the likelihood that the employment would have continued, and for how long, but for the wrongful discharge; (3) the employee's work and life expectancy; (4) the employee's efforts at mitigating his or her damages, including the nature of new employment, if any; (5) the availability of comparable employment opportunities; and (6) the length of time required to find another job. *See Sasser*, 839 S.W.2d at 434.

¶ 53.    In this case the employee was an employee of long standing. Although an employee at will, there was no indication that he was going to be discharged. According to the record the employee's salary level had been achieved in part through seniority, and his skills and employment history made it unlikely that he could obtain a comparable salary elsewhere. Front pay may be proper in this case if reinstatement is found not feasible.

## III.

¶ 54.  Finally, the court's decisions relating to public policy wrongful discharge actions give no guidance concerning the respective roles of the circuit court and the jury in determining the propriety and amount of remedies. The majority opinion, without discussion, mandates that front pay is to be determined by the court rather than by a jury.

¶ 55.  A growing number of courts in common law and statutory wrongful discharge actions have concluded that the question of the amount of front pay, and not simply its propriety, should be decided by the trial court, not by a jury. *See generally* Richard J. Seryak, *Front-Pay Awards in Employment Litigation: An Issue for the Judge or Jury?* 17 Employee Relations L.J. 131 (1991). The most common rationale for assigning this duty to the court is that front pay is essentially an equitable remedy in this context. *See Stafford v. Electronic Data Sys. Corp.*, 741 F. Supp. 664, 665–67 (E.D. Mich. 1990) (applying Michigan common law);[16] *Sasser*, 839 S.W.2d at 434–36. Front pay is awarded in lieu of the equitable remedy of reinstatement and is predicated on the equitable principle of making a wronged employee whole where there would otherwise be a remedial gap left by only awarding back pay.

¶ 56.  Courts have noted that it is practical to have the court charged with deciding the propriety of front pay also decide the amount. Entrusting the front-pay award to the court may also assure that front pay is

---

[16] In *Stafford*, 749 F. Supp. at 791–93, the court ultimately set front pay and ordered it paid on an "installment" basis whereby the court made biannual inquiry into the continued propriety of front pay, including the employee's employment situation and mitigation efforts.

not excessive or overly speculative under the circumstances of the particular case.

¶ 57.   The roles of the circuit court and jury were not briefed or argued by the parties and therefore I, unlike the majority opinion, would not decide this issue. I would remand this cause to the circuit court for determination of whether, after considering argument by the parties, a front-pay award should be made by a circuit court or by a jury. In the alternative, I would order additional briefing in this court.

¶ 58.   The majority directs that the circuit court is to decide the amount of the front-pay award, if appropriate. In this case the circuit court presented the issue to a jury. Should the circuit court determine that the plaintiff is entitled to front pay, the circuit court may consider the jury award of front pay in this case as advisory. Wis. Stat. § 805.02(1) (1995–96).

¶ 59.   For the foregoing reasons, I concur.

¶ 60.   I am authorized to state that Justice Ann Walsh Bradley joins this opinion.

¶ 61.   DONALD W. STEINMETZ, J. (*concurring*). I agree with the mandate of the majority in this case. However, due to the majority's treatment of the important issue of front pay as a possibility in future cases, I write separately solely to further discuss the issue of front pay. In keeping with the spirit of the employment-at-will doctrine, I note that the availability of front pay must be limited to cases in which the employee has been discharged in violation of a fundamental and well-defined public policy. Additionally, I write to further explain some of the situations in which front pay will and will not be available as a remedy instead of reinstatement. Finally, I write to stress that

136

the employee has a duty to mitigate all damages, including those awarded as front pay, and to explain the employee's duty to mitigate.

¶ 62. The employment-at-will doctrine recognizes "that where an employment [is] for an indefinite term, an employer may discharge an employee 'for good cause, for no cause, or even for cause morally wrong, without being thereby guilty of legal wrong.' " *Brockmeyer v. Dun & Bradstreet*, 113 Wis. 2d 561, 567, 335 N.W.2d 834 (1983). However, over the years, exceptions have been carved out of this rule through both legislative and judicial action. *See id.* It is now unlawful to discharge an employee, even an employee-at-will, because of race, color, religion, sex, or national origin. *See, e.g.*, 42 U.S.C. § 2000e, et seq.; Wis. Stat. § 111.31–111.395. In *Brockmeyer*, this court also held that it is unlawful to terminate an at-will employee if "the discharge is contrary to a fundamental and well-defined public policy as evidenced by existing law." 113 Wis. 2d at 573.

¶ 63. As with discriminatory discharges where front pay may be available only in limited circumstances,[1] this court held in *Brockmeyer* that "reinstatement and backpay are the most appropriate remedies for public policy exception wrongful discharges." *Id.* at 575. Based on *Brockmeyer*, then, I

---

[1] *See Fortino v. Quasar Co.*, 950 F.2d 389, 398 (7th Cir. 1991) ("the very possibility of front pay under Title VII is uncertain" though some courts have imposed it). *See also Griffith v. Colorado, Div. of Youth Servs.*, 17 F.3d 1323 (10th Cir. 1994) (front pay may be appropriate where reinstatement is simply not reasonable); *Gutzwiller v. Fenik*, 860 F.2d. 1317, 1333 (6th Cir. 1988) (back pay and reinstatement are the favored remedies for discrimination claims under Title VII, though front pay may be appropriate at the trial court's discretion).

stress that the majority opinion must be limited to extremely rare cases when an employee-at-will has been discharged in violation of a fundamental and well-defined public policy. Generally, however, reinstatement and back pay are the preferred remedies and front pay should be available only when reinstatement is "not feasible." Majority op. at 121.

¶ 64. The majority opinion provides some examples of when reinstatement would and would not be feasible. *Id.* However, I feel that it is important to expand on these examples and to stress that they are only examples. There will be numerous other situations in which reinstatement is required as a remedy and front pay is not an option. Reinstatement is not impossible in a situation where the discharged employee's former position is not available, but a substantially similar position in terms of job duties and salary is available. Reinstatement is not impossible simply because the employer and the employee do not get along, or the employee claims that he or she is not comfortable working for someone who previously terminated him or her. There are laws already in place to prevent an employer or its employees from retaliating against such an employee. *See, e.g.*, 42 U.S.C. § 2000e–3. Following the law as it is stated in *Brockmeyer*, I feel that front pay will only be properly awarded if the employer has no positions (or no positions substantially similar to the employee's pre-discharge position) available, or if the employer simply refuses to rehire the discharged employee.

¶ 65. Finally, I write to stress that a plaintiff who is awarded front pay necessarily has a duty to mitigate damages. This is a long-standing principle in Wisconsin law. *See Klug v. Flambeau Plastics Corp.*, 62 Wis. 2d 141, 155, 214 N.W.2d 281 (1974) (requiring that the

injured party in an employment situation "must make reasonable efforts to mitigate damages"); *Gauf v. Milwaukee Athletic Club*, 151 Wis. 333, 335, 139 N.W. 207 (1912) (damages in a wrongful discharge case are "subject to mitigation by the amount the employee earn[s], or might by the exercise of reasonable diligence [earn]"). *See also Marten Transport v. DILHR*, 171 Wis. 2d 147, 155, 491 N.W.2d 96 (Ct. App. 1992); *Hale v. Stoughton Hospital Ass'n, Inc.*, 126 Wis. 2d 267, 279, 376 N.W.2d 89 (Ct. App. 1985); *Koenings v. Joseph Schlitz Brewing Co.*, 123 Wis. 2d 490, 503, 368 N.W.2d 690 (Ct. App. 1985). Mitigation has always been required in employment cases. Consequently, I stress that a discharged employee has a duty to mitigate damages and to actively seek other employment if reinstatement is not possible. To hold otherwise would be to discourage the employee from seeking other employment entirely to the detriment of the employer.

¶ 66. The majority opinion touches on all of the aspects of front pay raised in this opinion. I write separately simply to further discuss these important issues and to provide guidance in future cases.

¶ 67. For the foregoing reasons, I write separately.