Charles J. Brockmeyer, Plaintiff-Respondent and Cross-Appellant,†

v.

Dun & Bradstreet, a foreign corporation with registered agent being C.T. Corporation System, Defendant-Appellant and Cross-Respondent.

Court of Appeals

No. 81–2024. Submitted on briefs August 2, 1982.—
Decided September 10, 1982.
(Also reported in 325 N.W.2d 70.)

† Petition to review granted.

For the defendant-appellant and cross-respondent the cause was submitted on the briefs of *Borgelt, Powell, Peterson & Frauen, S.C.,* by *Reuben W. Peterson, Jr.,* and *Lydia Y. Cooley,* of Milwaukee.

For the plaintiff-respondent and cross-appellant the cause was submitted on the brief of *Cape & Jones* by *Kent C. Jones,* of Milwaukee.

Before Decker, C. J., Moser, P. J. and Wedemeyer, J.

WEDEMEYER, J.   This is an appeal and cross-appeal from a judgment entered on October 19, 1981, in the circuit court for Milwaukee county, in favor of the plain-

tiff, Charles J. Brockmeyer (Brockmeyer), against the defendant, Dun & Bradstreet. We reverse the judgment and remand the matter to the circuit court with instructions to dismiss the complaint on the merits.

In this appeal we are asked to decide:

(1) whether Wisconsin has judicially abolished the employment-at-will doctrine;
(2) whether the trial court erred in submitting to the jury the question of whether the plaintiff was wrongfully discharged;
(3) whether the trial court erred in submitting the question of punitive damages to the jury; and
(4) whether the trial court erred in allowing the damages award to stand.

Our answer to question number two disposes of the remaining questions or at least renders them moot.

Recently this court accepted the proposition that a cause of action exists for wrongful discharge.[1] In so doing, however, we did not intend the acceptance to be the death knell of the employment-at-will doctrine.[2] We acknowledge that under certain circumstances private contract rights must assume a secondary position to the public interest. The development of this principle is not without foundation nor earlier scholarly examination.[3] Presently, although the public interest concept in employment relations law has not been exhaustively defined, certain touchstones have emerged from other jurisdictions that afford us some guidance. Recovery will be permitted if termination offends clearly defined public policy, or results from the exercise of bad faith, or re-

[1] *Ward v. Frito-Lay,* 95 Wis. 2d 372, 376, 290 N.W.2d 536, 537 (Ct. App. 1980).

[2] *Id.* at 377, 290 N.W.2d at 538.

[3] W. Prosser, *Handbook of the Law of Torts* § 92, at 613 (4th ed. 1971).

sults from malicious or retaliatory activity on the part of the employer.[4]

In June, 1977, Dun & Bradstreet promoted Charles J. Brockmeyer to the position of district manager of the credit service division for the state of Wisconsin. The terms of his employment agreement were such as to constitute an employment at will. On May 27, 1980, after a discussion between four national officers of Dun & Bradstreet and its corporate president, a decision was made by the president to terminate Brockmeyer. Reasons given for Brockmeyer's termination were, among other things: (1) smoking marijuana in front of employees; (2) lack of attention to job duties; (3) an open affair with his secretary; and (4) low morale among employees in his office. The meeting of May 27, 1980, was called only to determine whether to settle a civil rights suit filed by Brockmeyer's former secretary. At that meeting, the president of Dun & Bradstreet asked about the Milwaukee office. After discussing the problems in the Milwaukee office, the president decided to terminate Brockmeyer's employment. The national office informed the regional office on May 29, 1980, that Brockmeyer was to be immediately fired. A regional officer informed Brockmeyer of his termination at a Milwaukee meeting on May 30, 1980.

The events that occurred between June, 1977, and May 30, 1980, are the subject of this review to determine if the record contains sufficient evidence for a finding of wrongful discharge. We are mindful of the rigid standard of review established in reviewing a judgment on the sufficiency of the evidence.[5]

[4] *Palmateer v. Int'l Harvester Co.*, 421 N.E.2d 876 (Ill. 1981). This case presents an excellent survey of the current status of this concept.

[5] A verdict cannot be disturbed if there is *any* credible evidence which under *any reasonable view* fairly admits *of an inference*

Brockmeyer first asserts that the conduct of Dun & Bradstreet violated the clearly defined public policy of the state of Wisconsin as promulgated in sec. 111.01, Stats. (the objectives of the State Employment Relations Act), sec. 134.01 (restraint of trade) and sec. 134.03 (preventing pursuit of work). Brockmeyer requested the trial court to take judicial notice of secs. 111.01, 134.01, and 134.03; a request for which there was never a ruling. Brockmeyer also asked to include these statutes in the jury instructions, which request was denied.

We believe the trial court correctly denied the jury instruction request. There is no evidence from which to infer any application of the three statutes relating to a violation of clearly defined public policy.

Brockmeyer next suggests a violation of perjury (sec. 946.31(1), Stats.). Dun & Bradstreet personnel made a series of requests for a statement from Brockmeyer concerning his relationship with his secretary, who had been asked to and who did resign from the company. A review of the entire record reveals the following: On five separate occasions Brockmeyer was asked to submit a written statement regarding the circumstances of his involvement with his secretary. Brockmeyer refused to make a written statement. The record is barren of any requests directed to him by Dun & Bradstreet personnel to either tell a falsehood or suggesting the same. Brockmeyer did not say he was told to lie. The only mention in the record of possible lying is posited by Brockmeyer himself, when in response to questions, he volunteered that he told the individuals who made requests for statements that he would not lie, but only tell the truth. This

that supports the jury's findings. (Emphasis added.) *See Roach v. Keane*, 73 Wis. 2d 524, 536, 243 N.W.2d 508, 515 (1976); *see also* sec. 805.14(1), Stats. (standard of review of motions after trial verdict).

is not a reasonable basis from which an inference can be drawn that he was encouraged to utter a falsehood. Rather, it is sheer speculation without foundation. A wrongful discharge claim cannot be based on such speculation.

Brockmeyer's career with Dun & Bradstreet as a district manager may be characterized as inconsistent. For a time in 1978, he was on employment probation. By improving his performance Brockmeyer removed himself from probation. His sales ability potential was considered quite good. His income production was above average, but nevertheless, his superiors in Chicago were not satisfied with the performance of his other duties as a manager.

The events of the weekend of February 16, 1980, caused his immediate superiors some concern. They were informed that Brockmeyer, who was married but separated, was vacationing in Montana with his secretary when it was believed that he was performing his normal duties as district manager. Additional inquiries revealed that Brockmeyer had also smoked marijuana in the presence of company personnel. Supervisory personnel in Chicago sought permission from the national office to terminate or reassign Brockmeyer should they receive verification of these reports. Because of Brockmeyer's above average performance record, permission for termination or reassignment was denied. Instead, the supervisory personnel were directed to confront Brockmeyer with the information received to attempt to resolve the problem. Brockmeyer was called to a meeting in Chicago for this purpose. At that meeting he acknowledged a relationship with his secretary. He apologized for his absenteeism without notice. He admitted smoking marijuana and promised not to do it again. He further vowed to be attentive to business and to discharge his duties in a responsible and professional manner. In dating his sec-

retary, Brockmeyer had violated company policy. It was suggested at this meeting that Brockmeyer consider a sales job in another city in order to eliminate this violation of company policy. As an alternative, he was told to either find another position for his secretary within the company or she would have to seek employment elsewhere. At the conclusion of the meeting, Brockmeyer was firmly told that if there was not improvement in existing conditions, he would be terminated or reassigned.

Brockmeyer attempted to find a position for his secretary elsewhere within the company, but without success. He reported this to the Chicago office and was told that the only alternative left was to obtain her resignation. This was accomplished on February 25, 1980. The company told Brockmeyer to inform his secretary that it would, if asked, assist her in obtaining employment elsewhere.

In March, the Chicago office noticed a reoccurrence of inattentiveness to duty on Brockmeyer's part. For example, expected reports were arriving late. The company informed him of the problem and Brockmeyer agreed to rectify the situation.

In April, Brockmeyer's inattentiveness once again surfaced. The Chicago office had observed no improvement in his reporting to the regional and national offices. Earlier suggestions to Brockmeyer to solve this problem had not been followed. Brockmeyer again agreed to change his ways.

Between May 14 and 16, 1980, an annual communications session was held for Milwaukee office personnel. Both regional and national officers conducted the event. The purpose of the session was to encourage a free and open discussion among employees regarding any problems that might exist within the company. Among other matters, this session occasioned inquiries by two Milwaukee office employees concerning Brockmeyer's insufficient discharge of responsibilities.

Prior to this scheduled event, Brockmeyer's former secretary filed in the national office of the company an "open discussion letter" objecting to the way she had been treated. She also threatened legal action. A national officer was assigned to investigate the letter. This officer took advantage of his presence at the communication session to discuss the matter with Brockmeyer. Two discussions took place. At both discussions the officer asked Brockmeyer to submit a written statement. Brockmeyer refused. Prior to these discussions with Brockmeyer, but during the same time as the session, the national officer reviewed the entire office situation with Brockmeyer's immediate superior.

The session also furnished an occasion for Brockmeyer's immediate superior from Chicago to talk with Brockmeyer. They discussed Brockmeyer's lack of attentiveness to his duties, Brockmeyer's attitude toward his job and other general business matters. Although aware of the claim Brockmeyer's former secretary had filed with the company, the superior did not discuss the claim with him. Brockmeyer's response to his supervisor's observations was to point to the profits of the Milwaukee office, which Brockmeyer believed satisfactory.

On May 27, the national office of Dun & Bradstreet requested Brockmeyer to submit a written report about the course of events which led to the resignation of his secretary. He was asked by his immediate superiors in Chicago to submit the report in his own words and to do so immediately. Brockmeyer indicated that he had said everything he was going to say about the matter, and that he would not submit a written report. On that occasion Brockmeyer was twice asked to submit a report and he twice refused. The national office was immediately informed by phone by Brockmeyer's immediate superiors of the result of this communication with Brockmeyer. During the course of this phone conference,

Brockmeyer called back to his immediate superiors and informed them that he would adopt the thoughts that had been submitted by his secretary in the earlier filed "open discussion letter," or, as an alternative, he would rewrite the letter, sign it, and forward it as requested. He was informed by his immediate superior that that would not be sufficient.

On May 28, Brockmeyer called his immediate superior in Chicago and informed him that Dun & Bradstreet had settled with the former secretary. This development, Brockmeyer believed, meant there was no longer a need for the written report, but he was informed to the contrary.

Among the instructions given to the jury were included the definitions of retaliatory action, good faith and bad faith. Regarding retaliatory action, we find nothing in the record to support an inference that Brockmeyer was terminated for refusing to engage in illegal or immoral activities. Regarding bad faith, we can discover no circumstances from which a jury could reasonably infer that Dun & Bradstreet acted with the absence of honest, intelligent action and fair dealing. These instructions were erroneously submitted to the jury.[6]

Evidence of what transpired at the May 27 meeting in the national office of Dun & Bradstreet, attended only by national officers and the president, indicates that a variety of reasons were used as the basis for Brockmeyer's termination. All of these reasons are adequate to justify termination under the "employment-at-will" doctrine.[7]

---

[6] *See Lutz v. Shelby Mut. Ins. Co.,* 70 Wis. 2d 743, 750, 235 N.W.2d 426, 431 (1975).

[7] *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 285–86 (1977). (The United States Supreme Court held that

This case arises from the execution of proper business judgment, Brockmeyer's theorizing notwithstanding. In our judgment, Brockmeyer's claim is without foundation in the record.

Because we find that the record contains insufficient evidence to sustain Brockmeyer's claim that he was wrongfully discharged, we need not consider the other issues Dun & Bradstreet raises.

*By the Court.*—Judgment reversed and cause remanded with instructions to dismiss the complaint.

when an employee was terminated for a number of reasons, only one of which was unconstitutional, the cause of action failed because other reasons for termination were proper and sufficient.) In the case before us such a deficiency is not present. *A minore ad majus;* the case before us has greater weaknesses.